IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOSE LOUIS DURAN and EVELYN TORRES, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | NO. 06 C 6469 |
| CITY OF CHICAGO; PATRICIA L. LUTHER, in her official and individual capacities; and TINA FIGUEROA-MITCHELL, in her official and individual capacities, | ) ) ) ) ) | CHIEF JUDGE HOLDERMAN |
| Defendants. | ) ) | |

## DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL

Defendant City of Chicago, by its attorney, Mara S. Georges, Corporation Counsel for the City of Chicago ("City"), respectfully moves this court, pursuant to Fed. R. Civ. Pro. 50(b), for Judgment as a Matter of Law. Alternatively, the City moves for a new trial, pursuant to Fed. R. Civ. Pro. 50, or remittur of compensatory damages, and in support states:

## INTRODUCTION

After a seven-day jury trial in the above matter, the jury returned a verdict in favor of the Plaintiffs on five of the eight charges brought by them, and awarded damages in excess of four million dollars. However, as argued previously in Defendants' motion for Judgment as a Matter of Law submitted at the close of Plaintiffs' case, the evidence presented does not support a finding of liability against the City - no matter which employees of the City are named or considered Defendants. Therefore, this Court should grant the City's motion. Alternatively, this Court should order a new trial, or grant a remittur of the exorbitant compensatory damages.

## OVERVIEW OF THE EVIDENCE PRESENTED AT TRIAL

Plaintiffs brought this action alleging various constitutional and state law violations related to Detective Patricia Luther's investigation into the suspected child abuse of their daughter, E.D.

1

Specifically, Plaintiffs alleged five separate claims under Section 1983: false arrest/detention against Detective Luther; due process violations (both procedural and substantive) against Detective Luther and her colleague, Detective Tina Figueroa-Mitchell, related to polygraph exams requested by Detective Luther and administered by Detective Figueroa-Mitchell; an equal protection claim also related to the administration of the polygraph exams; and a conspiracy claim. Under Illinois state law, Plaintiffs alleged malicious prosecution, defamation, and intentional infliction of emotional distress ("IIED"). On the eve of trial, Plaintiff Torres dismissed her state law claims for assault and battery against Detective Luther.

The matter was tried before a jury from June 23, 2008 until July 2, 2008. At the conclusion of Plaintiffs' case in chief, Defendants moved for judgment as a matter of law. The court reserved ruling on that motion. On July 3, 2008, the jury returned a verdict in favor of the Plaintiffs on their claims of false arrest, violations of substantive due process and equal protection, defamation and IIED, and awarded Plaintiff E.D. two-and-a half million dollars in damages and $850,000.00 to each of her parents.

Before the matter went to the jury, the Plaintiffs dismissed the individual Defendants, and proceeded solely against the City pursuant to a stipulation entered by the parties that the City would agree to entry of judgment against the City for compensatory damages if the finder of fact found that any City employee violated Plaintiffs' constitutional rights. *See* Stipulation, attached. However, because there was no evidence presented that any City employee – whether the initially named Defendants or anyone else – violated Plaintiffs' rights, this court should find for the City as a matter of law.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 50 provides if the court does not grant a motion for judgment as a matter of law under subdivision (a), the movant may renew its request for judgment as a matter law ten days after entry of judgment. Fed. R. Civ. P. 50(b). Judgment as a matter of law is proper when the evidence presented, combined with all reasonable inferences permissibly drawn from that evidence, is sufficient to support the verdict when viewed in the light most favorable to the party

2

against whom the motion is directed. *see Ford v. Childers*, 855 F.2d 1271, 1274 n.4 (7th Cir. 1988).

For similar reasons, Federal Rule of Civil Procedure 59 allows parties to file, within ten days after entry of judgment, a motion for a new trial. Fed. R. Civ. Pro. 59(a). That same rule provides that within ten days a party may move to alter a judgment. Fed. R. Civ. Pro. 59(e). The Court may vacate or reduce the jury's compensatory damages verdict if the award has no rational connection between the evidence on damages and verdict. *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 516 (7th Cir. 1993), *citing Joan W. v. City of Chicago*, 771 F.2d 1020, 1023 (7th Cir. 1985).

# ARGUMENT

A. **The evidence presented shows the City is entitled to judgment in its favor on Plaintiffs' substantive due process claim**.

According to the jury instructions, to succeed on this claim Plaintiffs must show that any City employee "knowingly or with deliberate indifference misrepresented, caused to be misrepresented, withheld or caused to be withheld facts material to the investigation into E.D.'s injuries" and these acts "proximately caused the removal of E.D." from her parents' home or their continued separation. Although the jury found for the Plaintiffs on this claim, the evidence presented shows that no City employee misrepresented or withheld any facts material to the Department of Children and Family Services ("DCFS") investigation, and that none of the information provided by City employees to DCFS caused the initial removal or the continued separation.

The right to familial integrity is not absolute, and the government may act when it has a compelling interest to protect children. *Brokaw v. Mercer County*, 235 F.3d 1000, 1019 (7th Cir. 2000). In Illinois, one way in which the state, through DCFS, acts to protect children is by the execution of a voluntary safety plan. Not only is there case law upholding the legality and propriety of these safety plans (*see Dupuy v. Samuels*, 465 F.3d 757, 760-61 (7th Cir. 2005), but the propriety of the safety plan cannot be at issue in this case because the City had no role its execution or in any other action taken regarding E.D's custody.[1]

---

[1]Nancy Rodriguez testified that she called 911 when Plaintiff Torres would not cooperate with the safety plan, and further testified that she calls 911 when she has concerns that the lack of cooperation might lead to an unsafe situation. Both Plaintiffs testified that the three unnamed,

3

Thus, because the City had no role in the execution of the safety plan or any other legal proceeding regarding E.D.'s custody, Plaintiffs have crafted a sort "hybrid" due process claim alleging that Detectives Luther and Figeuroa-Mitchell withheld or mischaracterized evidence presented to DCFS which lead to this safety plan and subsequent custodial action by DCFS. However, although the jury accepted Plaintiffs' claim, other courts in this district have specifically rejected this type hybridization of the Constitution, especially where there is no trial right or other similar action at issue. *See Johnson v. Garza*, 08 WL 2700296 at 7 (Shadur), *applying McCann v. Mangialardi*, 337 F.3d 782, 787 (7th Cir. 2003). Even accepting this novel constitutional theory, as the evidence summarized below makes plain, the City had no involvement or influence whatsoever on any of DCFS's actions in relation to the Plaintiffs, and therefore cannot be liable for any damages DCFS's actions caused.

1. **The facts presented at trial make clear that the City's involvement with the DCFS investigation was limited and short-term.**

As Cindy Lilburn and Nancy Rodriguez of DCFS testified, their investigation in E.D.'s suspected abuse began on November 16, 2005, a full day before Detective Luther began her investigation. Detective Luther testified that when her investigation began on November 17, 2005, she contacted DCFS, St. Elizabeth's Hospital, and Plaintiff Duran about E.D.'s injuries. She learned from these sources that the child had already been discharged from St. Elizabeth's, that DCFS had not initiated a safety plan, and Plaintiff Duran believed the child had been injured at day care, which she had attended for approximately two weeks.

On November 18, 2005, one of Detective Luther's colleagues, Detective Brian Garrity, visited Plaintiffs' home and, as both parties testified, had a conversation with Plaintiff Torres in English and obtained her signature on a release for medical records from St. Elizabeth Hospital. Garrity also contacted Rodriguez and the day care providers, but was unable to communicate with

---

unidentified Chicago Police Officers who responded to Rodriguez's call were helpful, friendly, and told Rodriguez that she had to produce paperwork and some kind of identification to prove who she was, and to explain to Plaintiffs was exactly was going on. There was no testimony that any City employee coerced or threatened Plaintiffs into agreeing to the DCFS safety plan.

Milagros Vasquez because he does not speak Spanish, and could not reach Maria Barrera. Once Luther came on duty that evening, she spoke to Rodriguez and compared notes, especially about the treating physicians. Because the medical records at this time indicated both old and new fractures, Detective Luther asked Rodriguez if the child might have brittle bone disease, and could she be tested. Rodriguez testified that she agreed to pursue that option.

Both Detective Luther and Plaintiff Torres testified that Luther met with Plaintiff Torres on November 20, 2008. Detective Luther was accompanied by her partner, Detective Atiles (who speaks Spanish) because Detective Luther knew she needed a translator to talk to the day care providers. Both Detective Luther and Plaintiff Torres testified that their conversation was in Spanish (with Atiles translating) and English. Plaintiff Torres also signed a consent at that time to obtain medical records from Swedish Covenant Hospital, now that Luther was aware that the infant went to Swedish Covenant immediately after leaving day care. Plaintiff Duran was not present.

Detective Luther next went to Maria Barrera's home, and asked Barrera to take a polygraph exam. She agreed, and the exam was scheduled for the next day. Next, Detective Luther, with Detective Atiles acting as a translator, interviewed Vasquez and she also agreed to take a polygraph exam. On November 21, 2008, Barrera and Vasquez took polygraph exams with Detective Figeuroa-Mitchell, with Detective Atiles acting as a translator. Detective Figeuroa-Mitchell scored Barrera's results as inconclusive, and Vasquez as no deception indicated. Detective Luther then contacted the Plaintiffs to schedule polygraph exams with them. According to the testimony and Detective Luther's notes, the Plaintiffs agreed to take the exam on or about November 22, 2008 at another, future date because Plaintiff Duran would need to check with his work to see when he would be available.

While Detective Luther was pursuing her investigation, DCFS was also pursuing their own investigation, one that entailed no contact with anyone from the City between Luther and Rodriguez's November 18 phone call and a later conversation between those same parties on November 25, 2005. Notes and testimony provided by DCFS show that the Plaintiffs were reported as uncooperative with both DCFS and Detective Luther, and the medical evidence, according to Dr.

5

Michele Lorand from the Multidisciplinary Pediatric Education and Evaluation Consortium ("MPEEC"), strongly indicated child abuse. However, at this time Dr. Lorand had not yet ruled out old fractures, so DCFS and Detective Luther were operating under the belief that E.D. sustained a fracture to her tibia and another fracture that likely occurred prior to beginning day care with Barrera. Based on this record, on November 23, 2005, DCFS implemented a safety plan, and E.D. was removed from her home.

The evidence is undisputed that no one from the City was contacted prior to the execution of this safety plan, or consulted about its need or propriety. Rodriguez did not contact Luther until two days after the plan was implemented, on November 25, 2005. At that time Luther informed Rodriguez about the day care providers' polygraph results, and both Rodriguez and Luther testified that they discussed problems Luther was having with scheduling the Plaintiffs' polygraph exams. Rodriguez testified that she called Plaintiff Duran and told him Detective Luther was in her office, and that he should call her and schedule his appointment. Duran then called Luther, and scheduled Plaintiffs' exams for November 28, 2005.

On November 28, 2005, Plaintiffs took their polygraph exam. Both Plaintiffs were scored as deception indicated. However, this information was not provided to DCFS until December 6, 2005, approximately two weeks after the safety plan had been executed, and the December 6, 2005 conversation was one of the last conversations Rodriguez and Luther had regarding this case.

In the early morning hours of November 29, 2005, Detective Luther called the Cook County State's Attorney's felony review hotline for guidance, and was advised that there was not compelling evidence for even misdemeanor charges against any of the involved caregivers – Plaintiffs, Barrera or Vasquez. The Assistant State's Attorney advised Detective Luther to let DCFS conduct its investigation, which might lead to a temporary custody hearing. Since Detective Luther was unfamiliar with a temporary custody hearing, and later learned that she would not be involved with that procedure, she essentially suspended her criminal investigation. Detective Luther formally suspended her investigation in February, 2006.

**2.    No City employee deliberately misrepresented or withheld facts material to DCFS's investigation.**

6

Since no City employee was actually involved in the decision to remove E.D. from her home pursuant to a safety plan or the later decision to file a petition for adjudication of wardship, the crux of Plaintiffs' due process claim is that they were deprived of their right to familial integrity because of the Defendants' alleged false reporting of Plaintiffs' polygraph results and lack of cooperation with Detective Luther. As the evidence presented at trial makes plain, none of the information provided to DCFS by Detective Luther or any City employee was false, nor was any evidence withheld. Furthermore, none of the information provided was material to the investigation.

Beginning with Plaintiffs' allegations regarding polygraph testing, the evidence related to those exams was neither withheld or misrepresented. As to evidence supposedly withheld, Plaintiffs allege specifically that the actual charts related to the exams were not produced to DCFS or anyone else. Plaintiffs alleged in their complaint and throughout the litigation that these charts would enable them to prove that they in fact passed the exams. However, once those charts were produced to Plaintiffs, they could not prove that they had passed the exams. Their own expert concluded that, at best, the results were inconclusive. Furthermore, representatives from DCFS, MPEEC and the State's Attorney's Office testified that they do not seek any additional information – such as the pretest worksheets or charts at issue here – regarding polygraph results, so that information would not have changed their findings.

Regarding evidence that was supposedly misrepresented, Plaintiffs allege that the "false" polygraph information was that Plaintiff Torres took her exam in her native Spanish, when she actually took the exam in English. However, Torres was the individual who took the exam, and therefore could have informed DCFS or anyone else of that fact. Even if she had, as noted above, the evidence presented makes plain that the individuals and agencies who controlled E.D.'s fate at the time did not consider the polygraph results of any real importance. While Dr. Lorand from MPEEC acknowledged that information regarding the polygraph exam not being conducted in Spanish is included in her affidavit attached to the motion to voluntarily withdraw the Petition for Adjudication of Wardship for E.D., she also testified that this information was not at all dispositive or influential in her decision-making, and ASA Gail Vierneisel testified that the decision to drop the

7

Petition was not based on anything related to the polygraph test or anything else related to Detective Luther's investigation.

Similarly, Plaintiffs' allegations regarding allegedly false information pertaining to Plaintiff Duran's lack of cooperation with Detective Luther's investigation was not false. First, all of the documentation Plaintiffs relied on to establish this allegation comes from DCFS documents, and the "non-cooperative" language contained therein applies to both the police investigation and the DCFS investigation, as emphasized by Lilburn. Furthermore, Rodriguez testified that when she asked Plaintiff Duran if he was cooperating with the police investigation, he asserted that he was, and when encouraged by Rodriguez to cooperate by scheduling the polygraph exams, he did. Because Plaintiff Duran availed himself of the opportunity to clarify this supposedly false information, he cannot prevail on a due process violation.

### 3. None of the information provided by the City to DCFS caused the removal of E.D. from the home or the continued separation.

As explained in detail above, the evidence makes plain that DCFS executed its voluntary safety plan on its own accord, based on its own investigation, and not based on information provided by the City. In fact, DCFS removed E.D. from the home before Plaintiffs had even taken their polygraph exams, and before Detective Luther shared the results of the day care providers' exams. As the evidence presented shows, when DCFS executed the safety plan it was aware that E.D. presented at Swedish Covenant Hospital with no indication of trauma, but less than a day later presented at St. Elizabeth's Hospital with two broken arms which were indicative of child abuse. Additionally, when the safety plan was executed DCFS believed that E.D. had older fractures, which indicated that the day care center could not have been liable for these injuries. These factors, and not any polygraph results or other information from any City employee, caused DCFS to execute the safety plan and later to initiate the petition for adjudication of wardship proceedings. In fact, the polygraph results upon which Plaintiffs are so reliant in their due process claim were not communicated to DCFS until December 6, 2005, nearly two weeks after the safety plan was executed.

Simply put, the evidence does not show that any City employee caused DCFS to take action regarding E.D., and without a direct causal connection Plaintiffs' due process claim cannot succeed. Therefore, because the evidence presented does not support Plaintiffs' substantive due process claim, this Court should reverse the jury's finding.

B.   **The evidence presented at trial does not support Plaintiffs' equal protection claim.**

According to the jury instructions, to succeed on this claim Plaintiffs must show that any City employee denied Plaintiff the opportunity to take a polygraph exam in their first language, Spanish, despite allowing other similarly situated persons to take their exam in Spanish. Plaintiffs must also show that the City employee had no rational basis for the differential treatment, and the fact that the Plaintiffs were not allowed to take their polygraph exam in Spanish proximately caused Plaintiff's damages. Once again, although the jury found for the Plaintiffs on this claim, the evidence presented shows that the City employees who administered the polygraph exam had a rational basis for the differential treatment alleged, and the fact that the Plaintiffs took their exam in English did not cause the Plaintiffs' damages.

The above jury instructions show that this equal protection claim is brought under the "class of one" theory. Pursuant to this theory, a plaintiff must show he or she was subject to intentional treatment that is different from someone similarly situated, with no rational basis for such differential treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). The Supreme Court has recently clarified this "class of one" claim, holding that because state action involves discretionary decision-making based on wide array of "subjective, individualized elements," it is not necessarily a violation when one person is treated differently from others pursuant to such an assessment. *Engquist v. Oregon Dept. of Agriculture*, 2008 W.L. 2329768 at 8 (2008). In the Seventh Circuit, this alleged disparate treatment must be accompanied by evidence that the defendant acted deliberately with a "totally illegitimate animus toward the plaintiff..." *Hilton v. City of Wheeling*, 209 F.3d 1005, 1006 (7th Cir. 2000). Thus, ill will must be the sole cause of the complained action, and a showing of an 'uneven' act by law enforcement will not suffice. *Albeiro v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001).

9

Here, Plaintiffs' claim is based on Torres taking a polygraph exam in English while the daycare providers – Barrera and Vasquez – were provided interpreters. However, the evidence does not support a verdict for either Plaintiff on this claim.

### a. Plaintiff Duran

There was no allegation at trial that Plaintiff Duran needed or requested an interpreter for his polygraph exam, yet the jury found in Duran's favor. In fact, Duran testified in English at trial, and testified that he did not need an interpreter. He also testified that every conversation he had with Detectives Luther and Figueroa-Mitchell were in English, and that he had no problems communicating with them. In fact, there was no indication or evidence that Duran struggled with English. In direct contrast, both Detectives Luther and Figueroa-Mitchell testified that they could not communicate at all with Barrera and Vasquez without the assistance of an interpreter, a fact that was not in any way disputed or challenged at trial. Therefore, Plaintiff Duran was not similarly situated to Barrera and Vasquez.

Furthermore, that Plaintiff Duran was given his polygraph exam in English is the definition of the discretionary decision making based on "subjective, individualized elements" that the Supreme Court says must be analyzed in equal protection claims brought pursuant to a class of one theory. As noted above, the Detectives conducted all of their conversations with Plaintiff Duran in English, and had no indication that he needed – or even wanted – an interpreter for his polygraph exam. In fact, Plaintiff Duran testified at trial that he neither needed nor requested an interpreter at his polygraph examination. Furthermore, there is no evidence of any animus towards Plaintiff. Because Plaintiff Duran's "class of one" claims on these key elements, the verdict must be reversed.

### b. Plaintiff Torres

Similarly, Plaintiff Torres' equal protection claim is not supported by the evidence presented at trial, and in fact her claim is destroyed by her own testimony. Plaintiff Torres testified regarding the polygraph exam was that she would be "more comfortable" in Spanish rather than English. However, there is not a constitutional right to be "more comfortable," and Plaintiff Torres did not testify that she could not communicate in English, just that she was "more comfortable" in Spanish.

By contrast, Barrera and Vasquez were provided an interpreter because neither of them could communicate sufficiently in English, not because it was determined that Barrera and Vasquez would be more "comfortable" in Spanish.

Therefore, there is no evidence that other, similarly situated people were treated differently because the evidence is clear that Plaintiff Torres was not similarly situated to Barrera and Vasquez. Lilburn and Detectives Garrity, Luther and Figueroa-Mitchell all testified that Torres is quite capable of communicating in English. Detective Figueroa-Mitchell testified – and Defendant's exhibit 76 aptly demonstrates – that she and Plaintiff Torres had a lengthy conversation about when E.D. started day care. Plaintiff Torres confirmed that the information contained in Exhibit 76 is entirely accurate, and Detective Figueroa-Mitchell testified that she does not understand Spanish. Thus, this information came from a conversation, held entirely in English, between Figueroa-Mitchell and Torres. This evidence establishes that the decision to administer Plaintiff Torres' polygraph exam in English was based on a valid subjective, individualized assessment, and therefore proves that the City had a rational basis for the differential treatment.

Additionally, there is no evidence of any deliberate, intentional animus toward Plaintiff Torres by any City employee. Luther and Figueroa-Mitchell testified that if they were aware Torres needed or wanted an interpreter, one would have been provided. Furthermore, as noted above, the written evidence produced during Detective Figueroa-Mitchell's testimony clearly indicates that Torres had better than a passing, awkward understanding of English as she claims.

**c.     Damages**

Finally, as argued more fully above, there is absolutely no evidence that the Plaintiffs not being allowed to take their polygraph exam in Spanish proximately caused Plaintiffs' damages. DCFS executed its safety plan and removed E.D. from the home five full days before Plaintiffs took their polygraph exams, and DCFS did not find out the results of the polygraph exams until two weeks after the tests were taken. Therefore, the outcome of that exam did not change anything in regards to DCFS's investigation, and the City is entitled to judgment on this claim.

**C. Neither of the Illinois state law claims where the jury found for Plaintiffs are supported by the evidence presented at trial.**

Plaintiffs brought three claims at trial pursuant to Illinois state law: Malicious Prosecution, Defamation, and Intentional Infliction of Emotional Distress ("IIED"). The jury found in Plaintiffs' favor in their Defamation and IIED claims, yet these findings are not supported by the evidence.

**1. Defamation**

To prove a defamation claim under Illinois law, a plaintiff must show that the defendant made a false statement about the plaintiff, there was an unprivileged publication of that false statement to a third party by the defendant, and the plaintiff has suffered damages as a result of the publication. *Smock v. Nolan*, 362 F.3d 367, 372 (7th Cir. 2006), *citing Gibson v. Philip Morris Inc.*, 685 N.E.2d 638, 643 (1997). A statement is considered defamatory "if it tends to cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating with him." *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill.2d 1, 10, 607 N.E.2d 201 (1992), *citing* Restatement (Second) of Torts 559 (1977). Illinois recognizes five categories of statements that are defamatory per se:

> (1) those imputing the commission of a criminal offense; (2) those imputing infection with a loathsome communicable disease; (3) those imputing an inability to perform or want of integrity in the discharge of duties of office or employment; (4) those that prejudice a party or impute lack of ability in the party's trade, profession or business; and (5) those imputing adultery or fornication.

*Bryson v. News America Publications, Inc.,* 174 Ill.2d 77, 88-89, 672 N.E.2d 1207 (1996). However, "If a defamatory statement does not fall within one of the limited categories of statements that are actionable per se, the plaintiff must plead and prove that she sustained actual damage of a pecuniary nature ("special damages") to recover." *Id.* at 88.

First, neither statement Plaintiffs allege was false – whether the polygraph results or a lack of cooperation with the police investigation – fits into any category of defamation per se. Thus, Plaintiffs had to allege and prove special damages. Plaintiffs had a complete failure of proof as to this allegation. "[G]eneral allegations such as damage to one's health or reputation, economic loss, and emotional distress are insufficient to state a cause of action for defamation per quod." *Kurczaba*

*v. Pollock*, 318 Ill.App.3d 686, 694, 252 Ill.Dec. 175, 742 N.E.2d 425, 433 (2000).

Secondly, the supposedly false information was not an unprivileged disclosure to a uninterested third party. Instead, the allegedly false disclosure was privileged because it was made to a government agency, DCFS, as part of an on-going, separate but parallel investigation, and made within the scope of the City employee's official duties. *See Dolatowski v. Life Printing and Publishing Co.*, 197 Ill. App. 3d 23, 28 (1st Dist. 1990); *Barr v. Matteo*, 306 U.S. 564 (1959).[2]

As part of DCFS's investigation, and not because of any information regarding the polygraph exam or any other elements of the police involvement in the matter, DCFS executed a voluntary safety plan. DCFS executed the safety plan before Plaintiffs even took their polygraph exams, and well before the results of either their exams or those of the day care providers were communicated to DCFS. The evidence presented made plain that DCFS's decision to execute the safety plan was not related to this information, nor was the decision based on any information related by the City. Therefore, any purported damages are not related to this supposed defamation.

## 2. Intentional Infliction of Emotional Distress

According to the jury instructions, to succeed on this claim Plaintiffs must show that any City employee willfully and wantonly engaged in extreme and outrageous conduct, and that employee intended to engage in that conduct or was reckless in so doing. Each Plaintiff – Torres, Duran, and for this claim E.D. – must prove they suffered severe or extreme emotional distress, and this distress was actually and proximately caused by the employee's outrageous conduct. Although the jury found for the Plaintiffs on this claim, the evidence presented shows that no City employee engaged in any kind of extreme or outrageous conduct, and furthermore that any distress experienced by Plaintiffs was not actually or proximately caused by any City employee's actions.

---

[2]Most devastating to Plaintiffs' defamation claim is the fact that, according to the evidence presented, the only person who disclosed the supposedly false information to an unprivileged third party was Plaintiff Duran. Duran testified that he told numerous friends and family members about failing the polygraph exam, announced this information to his church at services, and even had the information broadcast on the Telemundo television station.

### a. Plaintiffs Duran and Torres

The only City employees mentioned in this case were Detectives Luther, Figueroa-Mitchell, Garrity and approximately three unnamed officers who responded to Rodriguez's 911 call. Plaintiffs testified that their experiences with Garrity and the unnamed officers were very pleasant, so the only City employees whose conduct could possibly be relevant to Plaintiffs' IIED claim are Detectives Luther and Figueroa-Mitchell. However, the conduct attributed to Detectives Luther and Figueroa-Mitchell was in no way extreme and outrageous. Their actions were consistent with a normal police investigation into child abuse, even including Plaintiffs' claims of being made to wait in the police station later than they expected and feeling like they were being accused of something is not extreme and outrageous. Instead, it is a mere threat or annoyance, something the jury was advised was insufficient to find for Plaintiffs on this claim.

Most importantly, there is absolutely no evidence that any City employee intended to engage in extreme or outrageous conduct or was reckless in so doing. First, as argued above, no City employee engaged in any extreme or outrageous conduct. The only intention demonstrated was Detective Luther's intention to investigate the abuse suffered by E.D. and determine if anyone should be held criminally liable for that abuse. Although Plaintiffs' counsel argued throughout that Detective Luther "arbitrarily" decided that the Plaintiffs were child abusers and communicated information in support of that theory to DCFS, the evidence shows that Detective Luther never accused anyone, including Plaintiffs, of child abuse. In fact, Detective Luther first suggested to DCFS that the child be tested for brittle bone disease, an act completely inconsistent with someone who sought to "blame" the Plaintiffs.

Plaintiffs Duran and Torres suffered distress while their daughter was removed from their home for approximately eight months. However, no one from the City caused that removal, and therefore no one from the City actually or proximately caused Plaintiffs' distress. Thus, the City cannot be liable on Plaintiffs Duran and Torres' IIED claim.

### b. Plaintiff E.D.

For slightly different reasons, the City also cannot be liable on E.D.'s IIED claim. The key

14

to an IIED claim is actual emotional distress, and in this case there was no evidence that E.D. suffered from emotional distress. Plaintiffs' purported expert into E.D.'s damages could not say the girl had any kind of developmental issues: first, because she did not know anything about the girl before the safety plan was executed, and second, because she only spent approximately two hours with the girl. Plaintiffs Duran and Torres testified that they have not sought any kind of counseling for the girl, and though they testified that they believe their daughter is delayed because she has problems speaking, their expert testified that she had conversations with the girl during the time she spent with her.

Simply put, the jury returned a huge verdict in E.D.'s favor based primarily on their speculation, their assumption, that the girl suffered from emotional distress. However, mere speculation is not enough to support their finding. Since the statute of limitations on E.D.'s claim will not expire until the girl is an adult, Plaintiffs could have brought the claim if they actually had evidence that she was suffering from severe emotional distress. But here, they did not have any such evidence, and therefore the jury's verdict must be reversed.

**D**. **Because Plaintiffs' cannot succeed by law on four of the five claims on which they received damages, this court should strike the monetary damage awards.**

On each of the claims, Plaintiffs alleged one source of damages – the time the family spent apart. Those damages were available on the substantive due process claim, but those damages do not relate to the other claims. For the reasons explained above, Defendant City was entitled to judgment as a matter of law on the substantive due process claim. As to the remaining claims, however, the damages alleged are not connected in any way to the claims themselves. Thus, the damage award should be stricken.

In particular, Plaintiffs Duran and Torres neither alleged, nor proved, they suffered any damages related to the time they spent at Area 3 waiting for the results of their polygraph examinations. The undisputed evidence established that they willingly rode with Detective Luther to the polygraph unit, willingly took their polygraph examinations, and willingly rode back to Area 3 with Detective Luther. Their sole issue was with the time they waited for the polygraph results.

15

They put no evidence into the record related to any damages they suffered as a result of sitting for that period of time. Instead, all of their damages related to the emotional distress they suffered after their child was removed from their home. Those damages are not related to, or caused by, the period of time they spent in Area 3.

Likewise, as argued above, Plaintiffs Duran and Torres neither attempted to nor proved special damages related to their defamation claim. They also made no attempt to connect the actions of any City employee to their intentional infliction of emotional distress damages, as the sum of their damages derived from DCFS' actions.

**E.     The damages verdict is not supported by the evidence and this court should reduce the award.**

As noted previously, a court may vacate or reduce the jury's compensatory damages verdict if the award has no rational connection between the evidence on damages and verdict. *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 516 (7th Cir. 1993), *citing Joan W. v. City of Chicago*, 771 F.2d 1020, 1023 (7th Cir. 1985). In this case, Plaintiffs' $4,200,000.00 total compensatory damages verdict is not supported by the evidence at trial, especially the two-and-half million dollars awarded to E.D.

As the City has noted throughout this litigation, it does not argue that Plaintiffs Duran and Torres were damaged while their daughter was removed from their home for approximately eight months. However, no one from the City caused that removal, and thus it cannot be liable for such large award to compensate for those damages. For those same reasons, the City cannot be liable for Plaintiff's E.D.'s enormous award, especially because there was no evidence of any actual damages to E.D. herself. Therefore, the verdict should be set aside or reduced.

WHEREFORE, for the above stated reasons, Defendants ask this Honorable Court to enter an order granting them judgment as a matter of law on Plaintiffs' federal claims, except that claim brought in Count I of the Third Amended Complaint, and on Plaintiffs' Illinois state law claims. In the alternative, it asks this Court to grant its motion for a new trial or enter an order of remittur of Plaintiffs' damages.

Respectfully submitted,

                                        MARA S. GEORGES
                                        Corporation Counsel for the City of Chicago

| /s/ Liza M. Franklin | BY: | /s/ Megan K. McGrath |
|---|---|---|
| Chief Assistant Corporation Counsel | | Assistant Corporation Counsel |
| Attorney for Patricia Luther and | | 30 North LaSalle Street, Suite 1020 |
| Tina Figueroa-Mitchell | | Chicago, Illinois 60602 |
| 30 North LaSalle Street, Suite 1400 | | (312) 744-8369 |
| Chicago, Illinois 60602 | | Atty. No. 06288408 |
| (312) 742-0170 | | |
| Atty. No. 06216088 | | |

/s/ Sanjay H. Patel
Assistant Corporation Counsel
Attorney for Patricia Luther and
Tina Figueroa-Mitchell
30 North LaSalle Street, Suite 1400
Chicago, Illinois 60602
(312) 742-3902
Atty. No. 06272840